## ELDER, ADMINISTRATOR, v. ERIE CANAL COAL COMPANY.

[No. 8,655.   Filed October 14, 1915.]

1. MASTER AND SERVANT.—*Safe Place to Work.*—*Mines.*—*Statutes.*—*"Or".*—Under §8582 Burns 1914, Acts 1907 p. 334, making it unlawful to construct any entry or trackway, after the taking effect of the act, in any coal mine where drivers are required to drive with mine cars, without a space on both sides of at least two feet in width and free from props, loose slate, etc., only such entries as are excavated after the act became a law come within its provisions, since the use of the word "or" is consistent with the assumption that the word "trackway" is an explanatory expression of the idea expressed by the word "entry", which refers to an opening in the mine in which a track is to be laid, rather than to the track itself; hence the act does not apply to an entry constructed prior to the enactment in which there has been a subsequent reconstruction of the track.   p. 603.

2. MASTER AND SERVANT.—*Safe Place to Work.*—*Mines.*—*Statutes.*—Where a driver operating a car in a coal mine is involved in a collision, wreck or other accident, produced by other causes than the failure of the mine operator to comply with §8582 Burns 1914, Acts 1907 p. 334, relating to the construction of entries, and such failure becomes the proximate cause of his injury by reason of his inability to escape from the car or track, the statute applies as well as in the case where the operator's failure to comply with the statute produces the collision, wreck or other accident as the proximate cause thereof resulting in the injury to the driver.   p. 605.

3. MASTER AND SERVANT.—*Injuries to Servant.*—*Evidence.*—*Jury Question.*—Where the evidence in an action for the death of a driver of cars in a coal mine was such as to produce uncertainty as to whether the accident occurred at a point in an old entry not within the provisions of §8582 Burns 1914, Acts 1907 p. 334, relating to the construction of entries, or whether it occurred at a point in an extension of the entry made since the act became effective, the question was properly for the jury and the court erred in directing a verdict.   p. 605.

From Gibson Circuit Court; *Lucius C. Embree,* Special Judge.

Action by Henry T. Elder, administrator of the estate of John Byers, deceased, against the Erie Canal Coal Company. From a judgment for defendant, the plaintiff appeals. *Reversed.*

*Tweedy & Youngblood, Ernest J. Crenshaw* and *Henry Kister,* for appellant.

*Albert W. Funkhouser, Arthur F. Funkhouser* and *Thomas Duncan,* for appellee.

CALDWELL, J.—Appellant's decedent, on September 20, 1910, while driving a mule harnessed to a train of coal cars in appellee's mine in Warrick County, was killed by coming in contact with the cars. He left a widow and infant children surviving him. This action brought by appellant to recover damages in behalf of the widow and children, on account of the killing of decedent, is based on section 1 of the act of March 9, 1907, in force April 10, 1907. Acts 1907 p. 334, §8582 Burns 1914. The section is as follows: "That it shall be unlawful for any owner, lessee, agent or operator of any coal mine within the State of Indiana, to make, dig, construct, or cause to be made, dug or constructed any entry or trackway after the taking effect of this act, in any coal mine in the State of Indiana where drivers are required to drive with mine car or cars unless there shall be a space provided on one or both sides continuously of any track or tracks measured from the rail, in any such entry of at least two (2) feet in width, free from any props, loose slate, debris or other obstruction so that the driver may get away from the car or cars and track in event of collision, wreck or other accident. It shall be unlawful for any employe, person or persons to knowingly, purposely or maliciously place any obstruction within said space as herein provided: *Provided,* That the geological veins of coal numbers three and four commonly known as the lower and upper veins in the block coal fields of Indiana shall be exempt from the provisions of this act." The second section of the act provides a penalty for the violation of the provisions of the first section.

At the close of appellant's evidence in chief, the jury, in obedience to a peremptory instruction given by the court

to that end, returned a verdict in favor of appellee. The basic question presented by this appeal is whether the court erred in giving such peremptory instruction. This basic question as presented divides itself into two secondary questions: (1) Whether the evidence brings appellee's case within the provisions of the quoted act, so that such act is applicable. (2) Assuming the act to be applicable, whether the evidence makes such a case as should have been submitted to the jury for determination.

There was evidence in substance as follows: The mine consisted of a perpendicular shaft sunk from the surface of the ground to the coal vein being mined, which vein was neither of those excepted from the provisions of the statute. From the bottom of the shaft, passageways, known as mine entries, extended in various directions through the coal vein, with lateral entries branching off on either side. On each side of an entry, there was a solid wall of coal left, among other reasons, for purposes of support. The faces of these walls were known as ribs. Through these entries, car tracks extended concentrating at the bottom of the shaft, on which tracks coal was transported to the bottom of the shaft by means of cars drawn by mules, and there elevated to the surface. One of such main entries known as the main south entry extended from the bottom of the shaft southward. Prior to the passage of said act of 1907, this entry had been excavated from the bottom of the shaft southward several hundred feet to an opening into the east mine known as the old breakthrough. This portion of the entry was known as the old entry south. In July, 1907, after said act became a law, this entry was extended southward by an excavation that curved slightly to the west and then to the east following the coal vein up a three per cent grade to a place known as the top of the hill, at which cars loaded with coal were assembled for purposes of transportation to the bottom of the shaft. In May, 1908, after said act became a law, appellee removed, repaired and replaced

a considerable portion of the track in the main entry south, commencing at a point south of the bottom of the shaft near the second entry west, and from thence south to the end of the old entry, and thence southward through the extension to the top of the hill. In doing this work, the old track was removed, the road bed leveled, new crossties laid, and new iron and steel substituted in place of the old rails some of which were wooden and some metal. A witness designated the old track as a temporary or workout track. At one point also a corner of coal was chipped from the east rib, leaving the clearance at that point ten to twelve inches.

There was other evidence bearing more particularly on the second of said secondary questions, to the following effect: On the morning of September 20, 1910, appellant's decedent, employed by appellee as a driver, started from the top of the hill with a train of three cars, loaded with coal and drawn by a mule. The proper position for the driver is to stand with his right foot on the front bumper of the front car, the left foot on the tail chain, the right hand on the car, and the left hand on the mule's rump. The tail chain extends from the singletree to a hook attached to the bumper. It was decedent's custom to occupy such position while driving, but there was no evidence that he followed such custom on this occasion. A few minutes later his dead body was found at a point in the old part of the entry about thirty-five feet south of the second west entry. The head and shoulders were wedged between the front car and the east rib, the body extending onto the track, held in contact with the wheels of the front car. The body was nearly severed at the waist line, evidently by the wheels on the east rail having come in contact with it. There were other injuries including a slight wound or abrasion on the right side of the head near the forehead. The rear wheels of the front car and the front wheels of the second car were off the track to the west. The mule

with tail chain detached from the car was about thirty feet north. Decedent's cap was found on the east side of the track twenty to twenty-eight feet south of the body and 250 feet north from the top of the hill. The cap was slightly torn or cut, and there were hair and traces of blood on the inside of it. A few feet north of the cap there was a little blood two feet up on the east rib, and also at places between there and the body, and also on lumps of coal east of the track. Nearly opposite the body there was blood and a piece of flesh eight inches up on the east rib. There were indications east of the track and south of the body that it had been dragged a few feet.

The east rail was eleven inches from the rib at the body, eighteen inches at the cap and a wider clearance south. The west rail was six to eight feet from the rib at the body, with a line of props three feet from the rail. South fifty to sixty feet the west rail was within fourteen to sixteen inches of the rib. East of the track extending south from the body were scattered lumps of coal and some evidence that there was trash from the mine consisting of stone, clay, slate, etc., known as "gaub", the latter sloping up from the rail to a foot thick at the rib. On the west side from the body south about fifty feet, the gaub was eight inches deep at the rail, and sloped to three feet deep at the rib, and some evidence that in places the rail was covered with gaub and coal.

It seems to be clear under the evidence that the point where the body lay was within the old part of the entry. There was controversy, however, whether the point where the cap was found was within the old entry or within its extension. Appealing to the evidence, appellee contends for the former location, appellant the latter. To settle the controversy would require that we weigh the evidence and accept as true certain measurements and estimates to the exclusion of others. It is probable that much uncertainty might have been removed had certain plats referred to by

counsel and witnesses at the trial been introduced in evidence with a clear explanation thereof.

The parties do not agree on their interpretation of the act of 1907. Appellant argues that the transaction that gives vitality to the act in a given case within the meaning of the words "after the taking effect of this act" is not only the excavating of an entry and the laying of a track therein, but also the mere laying or relaying of a track in an entry excavated before the act became a law; that if prior to the time when the act went into force, an entry had been excavated in the process of developing the mine and a track laid therein after the act became a law, or if at the time when the act took effect a track was being operated in an entry theretofore excavated, and such track was thereafter taken up and a new track laid, the act applies. Appellee, however, contends that the act extends only to entries excavated after it became a law. Appellant to sustain his contention argues that the term "trackway" as used in the act, has reference to the track as distinguished from the excavation on the bed of which the track is laid; while appellee argues that the terms "entry" and "trackway" are practically synonymous as used in the act. We are, therefore, required to construe the act. While this act has been interpreted by the Supreme Court to the extent necessary in upholding its constitutionality (see, *State* v. *Barrett* [1909], 172 Ind. 169, 87 N. E. 7, and *Barrett* v. *State* [1911], 175 Ind. 112, 93 N. E. 543), our search has failed to disclose that it has been construed in its relation to questions here involved, or that a construction has been placed on any similar act in a like relation by courts of other jurisdictions. In endeavoring to construe this statute, there are two matters to be kept in mind, each of which may be fairly gathered from the language employed by the lawmaking body, (1) that it was evidently within the legislative purpose to safeguard certain persons or classes of persons; and (2) that in so doing an

important industry of the State, in the successful prosecution of which not only the operators but also the public are interested, should not be unreasonably hampered. The first of these purposes is indicated somewhat by the language "so that the driver may get away from the car or cars and track in the event of a collision, wreck or other accident". We construe this language, however, as illustrative of the extent and nature of the clearance to be provided, rather than as limiting the class of persons to be afforded protection, or the circumstances under which they shall be safeguarded. We believe the legislative intent as gathered from the act to have been no narrower than that the clearance required by the act should afford a means of protection to drivers under all circumstances while properly operating cars within the kind of entry specified by the act.

As to the second proposition, the language "after the taking effect of this act" indicates what entries come within the provision of the law. We believe it to have been within the legislative mind that an entry excavated in the course and as a part of the plan of developing the mine has an element of permanency; that it is excavated somewhat with relation to other entries and the dividing walls of support. We are, therefore, of the opinion that only entries excavated after the act became a law come within its provisions. The use of the phrase "entry or trackway" does not necessarily argue against our conclusion. The word "or" is frequently used in a synonymous or explanatory sense; to connect two words which express the same idea. 29 Cyc. 1502; *Arthur* v. *Cumming* (1875), 91 U. S. 362, 23 L. Ed. 438. The use of the word "or" is therefore consistent with an assumption that the word "trackway" is an explanatory expression of the idea expressed by the word "entry"; that the reference is to an opening in a mine in which a track is to be laid; that it has reference to a place where a track is laid rather than to the track itself. This conclusion is

supported by the fact that in other connections in the act, the word "track" rather than "trackway" is used where the reference is to the structure designed for the passage of cars. Neither do we believe that the use of the words "make and construct" argues against our conclusion. While doubtless it is true that where the reference is to a material thing fabricated by human effort these words primarily mean the bringing together of the parts that compose an entire structure, yet among the many shades of meaning in which they are used are those broad enough to include the excavating and shaping of an entry.

It is evident from what we have said that only the extension of the old south entry being the entry from the old breakthrough to the top of the hill comes within the provisions of the act of 1907. That part of the entry was excavated after the act became a law.

Returning to a more specific consideration of the errors assigned, a driver operating a car in a mine may be involved in a collision, wreck or other accident, produced by other causes than the failure of the mine operator to comply with this statute, and thereupon such failure may become the proximate cause of his injury suffered by reason of his inability to escape from the car or track; or the failure of the operator to comply with the statute may produce the collision, wreck or other accident as the proximate cause thereof, resulting immediately in the injury of the driver; or the collision, wreck or other accident, having been so produced, the failure of the operator to comply with this statute may be the proximate cause of an injury suffered by the driver by reason of his inability to escape from the car or track. In either of such cases, in our judgment, the statute is applicable.

On the record, as it comes to us, there is, as we have indicated, uncertainty respecting the location of the 3. initial point of the accident, and whether such point was within the old entry or the extension thereof.

Metropolitan Life Ins. Co. *v.* Stenger—59 Ind. App. 606.

There was some evidence that might warrant an inference that such point was within such extension. There were also facts and circumstances in evidence possibly authorizing the conclusion that the accident was caused primarily by insufficient clearance being provided in such extension, and also that obstructions in such extension may have prevented the escape of the decedent. Much of the uncertainty grows out of conflicting evidence, estimates and measurements of distances. Under such circumstances, we are impressed as the record comes to us that the case should have been submitted to the jury under proper instructions. On a retrial much of the uncertainty may be removed and thereby the ends of justice clearly attained. The judgment is reversed with instructions to sustain the motion for a new trial.

NOTE.—Reported in 109 N. E. 805. As to duty of master to servant, see 75 Am. St. 591. "Or" in statute or ordinance, see Ann. Cas. 1913 A 1058. See, also, under (2) 26 Cyc. 1092; 29 Cyc. 496; (3) 26 Cyc. 1460.